**In the Matter of the WELFARE OF D.D.G.**

No. C8–96–455.

Court of Appeals of Minnesota.

Aug. 27, 1996.

Review Granted Nov. 20, 1996.

Mark A. Paige, Strandemo & Sheridan, P.A., Inver Grove Heights, for appellant father.

James C. Backstrom, Dakota County Attorney, Kathryn P. Scott, Assistant County Attorney, Dakota County Judicial Center, Hastings, for respondent Dakota County.

Susan Bates Gegen, Gegen Law Firm, St. Paul, for guardian ad litem.

Considered and decided by PARKER, P.J., SHORT, J., and FOLEY, J.*

## OPINION

PARKER, Judge.

Appellant Avery Hobbs is the adjudicated father of D.D.G. Respondent Dakota County Social Services filed a petition for involuntary termination of parental rights of Hobbs and D.D.G.'s mother. Hobbs appeared at the termination trial, but D.D.G.'s mother did

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

not. The parental rights of D.D.G.'s mother were terminated by default.

On the second day of trial, Hobbs consented on the record to termination of his parental rights. He filed a direct appeal to this court from the resulting June 5, 1995, order terminating parental rights based on his consent (C0–95–1458). A special term panel of this court dismissed the appeal to allow Hobbs to move the trial court to vacate the June 5 order. The trial court denied the motion by order of January 31, 1996; and this appeal followed.

## FACTS

D.D.G. was born on January 20, 1993. Hobbs lived with D.D.G. and D.D.G.'s mother from about February 1993 until September 1993. He was convicted of fifth-degree assault against D.D.G.'s mother as a result of a domestic abuse incident in July 1993 and was subsequently convicted of third-degree assault for an October 1993 incident in which he broke her jaw.

D.D.G. was adjudicated a child in need of protection or services and was placed with his maternal grandparents in December 1993. Hobbs was allowed supervised visitation. As a result of the assault convictions and a terroristic threat conviction, his probation for a cocaine possession conviction was revoked and he was incarcerated at the state prison in May 1994. In August 1994, Hobbs was transferred to another correctional facility, with a potential release date of August 6, 1996. At the time of the May 1995 termination trial, he had had a total of three supervised visits with D.D.G. in prison. Hobbs had not contributed anything to D.D.G.'s support or otherwise contacted him since the child was placed with his maternal grandparents in December 1993.

On the first day of the termination trial, Hobbs acknowledged his need for chemical dependency and anger management treatment. He stated he had to get his life under control before he could even consider trying to raise D.D.G. D.D.G.'s maternal grandmother testified that D.D.G. is very close to

his half-brother, who is also living in the grandparents' home. The grandmother stated that she and her husband are willing to adopt both children.

On the second day of the termination trial, counsel advised the court that Hobbs had agreed to the county's offer to dismiss the grounds for involuntary termination and amend the petition to allow Hobbs' voluntary termination of parental rights. Hobbs testified he had ample opportunity to discuss the case with his counsel, that he was satisfied with his counsel's representation, and that his decision was based on what he thought was best for D.D.G. Hobbs acknowledged his understanding that once the termination order was entered, the decision was final and he would not be able to change his mind.

Hobbs' counsel also questioned him regarding his understanding of certain conditions that he had asked Dakota County to impose on whoever adopts D.D.G. A June 5, 1995, termination order incorporates the conditions, which include: (1) that Hobbs keep the adoptive parents informed of his address so that the adoptive parents can send a videotape and picture of D.D.G. near the child's birthday; (2) that Hobbs be allowed to place cards and letters in the termination of parental rights file, which would be available to D.D.G. at his request on his 18th birthday, or earlier, if D.D.G.'s therapist so recommends; and (3) that if D.D.G.'s therapist determines it is in the child's best interests, supervised visitation between Hobbs and D.D.G. may occur within a therapeutic context.

The trial court found there was good cause to terminate Hobbs' parental rights voluntarily because of D.D.G.'s lengthy out-of-home placement and his need for permanence, Hobbs' unavailability to parent D.D.G. for a substantial period of time due to his incarceration and need for treatment, and his acknowledgement that the domestic violence, drug use, and police raids that occurred in the home he shared with D.D.G.'s mother had been harmful to the child.

Following this court's dismissal of Hobbs' direct appeal from the June 5, 1995, termination order, he moved the trial court to vacate that order, arguing that he intended only to suspend, rather than terminate, his

parental rights, that he did not have an adequate opportunity to consult with counsel, and that he was incapable of making a rational decision because of the turmoil in his life. At the motion hearing, Hobbs' counsel raised the additional arguments that his client was induced to give up his parental rights based on unenforceable conditions imposed on the prospective adoptive parents and that there was no showing of good cause for the termination. Over the county's objection, the trial court allowed Hobbs' counsel to proceed with arguments as to illusory promises and good cause. The court also denied the county's motion for dismissal of Hobbs' motion to vacate on the ground that it was untimely. In the January 31, 1996, order denying Hobbs' motion on the merits, the court found that Hobbs clearly understood he was terminating his parental rights and that he would have access to the court to enforce his contract rights as part of the termination agreement.

## ISSUES

I. Did the trial court err as a matter of law in terminating Hobbs' parental rights under Minn.Stat. § 260.221, subd. 1(a) (Supp. 1995), in the absence of his written consent?

II. Did the trial court abuse discretion in denying Hobbs' motion to vacate the voluntary termination of his parental rights on the basis that the "open adoption" conditions of the termination agreement were unenforceable?

## DISCUSSION

### I.

As a matter of law, termination of parental rights is not a preferred action. *In re Welfare of M.G.*, 407 N.W.2d 118, 120 (Minn.App.1987). Upon review of an order terminating parental rights, the appellate court determines whether the trial court's findings address the statutory criteria, are supported by substantial evidence, and whether they are clearly erroneous. *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn.1990).

■ The court may terminate parental rights "[w]ith the written consent of a parent who, for good cause, desires to terminate parental rights." Minn.Stat. § 260.221, subd. 1(a). The court may involuntarily terminate parental rights if it finds that one or more of specifically enumerated circumstances exists. *Id.*, subd. 1(b). "The provisions of subdivisions 1(a) and 1(b) are distinct, and circumstances that justify involuntary termination of parental rights under subdivision 1(b) do not necessarily justify the voluntary termination of parental rights under subdivision 1(a)." *In re Welfare of J.D.N.*, 504 N.W.2d 54, 56 (Minn.App.1993).

■ Hobbs argues that the voluntary termination of his parental rights pursuant to Minn.Stat. § 260.221, subd. 1(a), must be vacated because he did not execute a written consent to the termination. The county contends Hobbs has waived the written consent requirement because he did not object to the procedure of stating his consent on the record at the termination trial and because he has raised this issue for the first time on appeal.

■ This court may review an issue for the first time on appeal "where to decline review would work an injustice or infringe upon a constitutional right." *Hyduke v. Grant*, 351 N.W.2d 675, 677 (Minn.App.1984). Due to the gravity of the proceedings, we will review the issue despite Hobbs' failure to raise it in his motion to vacate. *See In re Welfare of A.D.*, 535 N.W.2d 643, 647 (Minn. 1995) (there is perhaps no more grave matter that comes before the court than the termination of a parent's relationship with a child); *In re Welfare of S.R.A.*, 527 N.W.2d 835, 837 (Minn.App.1995) (although parent failed to move for a new trial, evidentiary issues raised on a direct appeal from a termination order may be reviewed in the interest of justice), *review denied* (Minn. Mar. 29, 1995).

■ Establishment of grounds for termination under Minn.Stat. § 260.221, subd. 1(a), requires a showing of (1) voluntary consent in writing, and (2) good cause. *In re*

*Welfare of J.M.S.*, 268 N.W.2d 424, 427 (Minn.1978). Although Hobbs indicated his consent to termination on the record, the record does not show that he expressly waived the statutory requirement for written consent.

■ The statute requires only "written consent" to the termination, without prescribing any particular formalities. *In re Welfare of K.T.*, 327 N.W.2d 13, 17 (Minn. 1982). The statutory requirement is not met in this case because Hobbs did not execute any form of written consent. *See* Minn.Stat. § 645.445, subd. 14 (1994) ("written" includes any mode of representing words and letters, and the signature of a person able to write must be in the handwriting of the person). The lack of his written consent requires reversal of the order terminating parental rights under Minn.Stat. § 260.221, subd. 1(a). *See In re Welfare of Larson*, 312 Minn. 210, 218, 251 N.W.2d 325, 331 (1977) (no evidence for the trial court to terminate parental rights where there is no written consent executed by the parent in the record and it is doubtful whether parent was made aware of the possible ramifications of the petition); *In re Welfare of Alsdurf*, 270 Minn. 236, 239, 133 N.W.2d 479, 481 (1965) (there must be "strict adherence to the letter of the law" regarding the dissolution of a parent-child relationship).

## II.

■ An order terminating parental rights can be set aside upon a showing of fraud, duress, or undue influence. *K.T.*, 327 N.W.2d at 17–18. "Undue influence" means "coercion, amounting to a distraction of one's free will, by means of importunities, flatteries, insinuations, suggestions, arguments, or any artifice not amounting to duress." *In re Welfare of N.M.C.*, 447 N.W.2d 14, 16 (Minn. App.1989) (citation omitted). Hobbs argues that the order terminating his parental rights should be vacated because he was induced to give up his parental rights by the illusory "open adoption" conditions.[1]

---

1. The county challenges the trial court's denial of its motion to dismiss Hobbs' motion to vacate as untimely and on the ground that it fails to state a claim upon which relief can be granted. We decline to review this issue because the county failed to file a notice of review under Minn. R. Civ.App. P. 106. *See Kolby v. Northwest Produce Co.*, 505 N.W.2d 648, 653 (Minn.App.1993)

The county argues that Hobbs' consent to the termination was not conditioned on the open-adoption terms and that the county simply agreed to these terms as an additional benefit to him. The record, however, indicates that the open-adoption conditions were part of the agreement between the county and Hobbs for dismissal of the involuntary termination petition upon his consent to termination of his parental rights. Hobbs was questioned regarding his understanding of the conditions at the termination trial, and the conditions were incorporated into the termination order.

Minnesota law does not recognize "open adoptions." *In re Adoption of C.H.*, 548 N.W.2d 292, 297 (Minn.App.1996), *review granted* (Minn. Aug. 6, 1996). Upon the termination of parental rights, all rights, including any rights to custody, control, visitation, or support existing between the child and parent, shall be severed, and the parent shall have no standing to appear at any further legal proceeding concerning the child. Minn.Stat. § 260.241, subd. 1 (1994). Similarly, the adoption statute provides that after a decree of adoption is entered, "the birth parents of an adopted child shall be relieved of all parental responsibilities for the child, and they shall not exercise or have any rights over the adopted child or the child's property." Minn.Stat. § 259.59, subd. 1 (1994). The "open adoption" conditions of the termination agreement are illusory, because the birth parent, Hobbs, has no standing to enforce the conditions.

Because Hobbs was not advised that he would have no recourse if the adoptive parents failed to comply with the conditions, his consent to the termination of his parental rights was not voluntary. It was an abuse of discretion for the trial court to deny the motion to vacate the termination order brought on this ground.

## DECISION

The trial court's order terminating appellant's parental rights on the basis of appellant's consent pursuant to Minn.Stat. § 260.221, subd. 1(a), is reversed and vacated on the grounds that the statutory requirement of written consent was not met; the order for voluntary termination is invalid because Hobbs was not advised that he has no standing to enforce the "open adoption" conditions in his agreement with Dakota County. Respondent county is not precluded from filing a new petition for involuntary termination of appellant's parental rights, if appropriate. Because we reverse the voluntary termination order on these grounds, we do not address the other issues appellant raises.

**Reversed and order of termination vacated.**

(court of appeals will not consider a challenge to issues decided adversely to a respondent when respondent has not filed a notice of review). Moreover, we note that Hobbs' motion to vacate was timely brought within one year of the June 5, 1995, termination order. *See* Minn. R. Civ. P. 60.02.