In the Matter of the
WELFARE OF N.M.C.

No. C8–89–663.

Court of Appeals of Minnesota.

Oct. 24, 1989.

Michael Stephan, Eric S. Rehm, Burnsville, for appellant.

Cheryl Speeter Margoles, Speeter, Johnson, Hautman & Olson, Minneapolis, for Catholic Charities.

Thomas J. Norby, Wright S. Walling, Mahoney, Walling & Kelley, Minneapolis, for Adoptive Parents.

Heard, considered and decided by SCHUMACHER, P.J., and FORSBERG and GARDEBRING, JJ.

## OPINION

FORSBERG, Judge.

K.L.C. appeals dismissal of her petitions to set aside termination of her parental rights to her son, N.M.C. We affirm.

## FACTS

Appellant gave birth to N.M.C. on May 11, 1988. She was 18 years old at the time and unmarried. After meeting with a social worker from respondent Catholic Charities of the Archdiocese of St. Paul and Minneapolis (Catholic Charities), appellant consented to placement of N.M.C. in a foster home. She visited him one hour per week for the next few months. She also met regularly with the social worker from Catholic Charities as part of a counseling program to help her explore the various options available to her.

On July 29, 1988, Catholic Charities filed a petition for termination of parental rights. About a month later on August 30, appellant signed an Affidavit of Parental Consent in which she specifically consented to termination of her parental rights and acknowledged:

> This consent is executed of my own free will and accord and is not procured through any duress or under any influence or fraud. I give this consent believing it to be in the best interests of my child.

A hearing to consider termination of appellant's parental rights was held on September 6 before a referee. The referee questioned appellant as follows about her decision:

> THE COURT: Now, this, obviously, is an important decision. If you would like

additional time, this hearing could be continued until another day to allow you time to talk with a lawyer or [the social worker from Catholic Charities] or anybody else or if you feel you need more time.

On the other hand, if you feel that you do understand the finality of the order today terminating your parental rights, that it would be final, and wish to go ahead based on the fact that you have made up your mind, you may do that.

Now, do you think you would like additional time or do you feel that you have made a final decision?

[APPELLANT]: I feel I've made a firm and final decision.

Upon further questioning, the referee determined that appellant understood the meaning of "termination of parental rights," that her decision was "final," and that she knew financial assistance was available if she chose to keep N.M.C. Finally, appellant responded affirmatively when asked if this was "your own decision without any improper pressures from anyone or offers of any kind from anyone?" Following the hearing, an order was issued terminating appellant's parental rights.

Shortly thereafter, Catholic Charities was notified that the prospective adoptive couple whom appellant had selected from several profiles declined to adopt N.M.C. Appellant was allowed to choose another couple. In late September N.M.C. was placed with his adoptive parents, who are respondents in this appeal.

On January 26, 1989, appellant filed a Petition to Set Aside Termination of Parental Rights. In the attached affidavit, she states she "realized I had made a mistake and wished to reverse my decision." She further explains that "[m]y parents and friends became more supportive" and "[t]hat I have the consent and support of my family to live at home with [N.M.C.] if I can get him back."

At a hearing on February 2, Catholic Charities moved to dismiss the petition for failure to state a claim upon which relief may be granted. Appellant was given time to amend her petition.

Appellant thereafter filed an Amended Petition to Set Aside Termination of Parental Rights. A second hearing was held on February 13. Catholic Charities again moved to dismiss. The parties were given additional time to file supporting memoranda.

On March 15, the district court issued an order with attached memorandum dismissing the petitions. Appellant immediately filed a motion to reconsider, which was heard on March 16. Appellant appeared at this hearing and was given an opportunity to speak. In an order dated March 21, the court reaffirmed its March 15 order dismissing the petitions.

This appeal followed.

## ISSUE

Did the district court err in dismissing the petitions?

## ANALYSIS

A termination order based upon the voluntary, informed consent of a parent cannot be set aside simply because that parent "has changed her mind or her circumstances have otherwise changed. Some serious and compelling reason must exist in order to once again uproot the child and dramatically change his living environment." *In re Welfare of K.T.*, 327 N.W.2d 13, 18 (Minn.1982). Such an order can be set aside only upon a showing of fraud, duress, or undue influence. *Id.* at 17–18 (citing *In re Welfare of J.M.S.*, 268 N.W.2d 424, 428 (Minn.1978)).

Appellant argues the district court erred in dismissing her petition and amended petition without providing her an evidentiary hearing. She insists she is entitled to her "day in court" in order to present testimony on her claims of undue influence and duress. Respondents counter the petitions were properly dismissed because appellant failed to allege any facts in support of her claim that she was unduly influenced by Catholic Charities.

Appellant's original petition contained no allegations of fraud, duress, or undue influ-

ence. It merely states "the Affidavit of Parental Consent is faulty and did not allow [me] proper time to consider [my] decision and the effects of that decision." In a supporting affidavit, she states "I realized I had made a mistake and wished to reverse my decision" and "I believe I made an error when I signed the Consent." Other reasons cited in her petition were newfound support from family and friends, an alleged technical defect in the Affidavit of Parental Consent, and the failure of the originally selected couple to complete the adoption. These claims, which challenge the grounds for termination as opposed to the voluntariness of the consent, were each addressed and rejected by the district court in the memorandum attached to its March 15 order. We agree with the court's reasoning, which has not been challenged by appellant in this appeal.

Appellant's amended petition does include the words "duress" and "undue influence." However, without supporting facts those words are conclusory and insufficient to withstand a motion to dismiss. "Duress" has been defined as "coercion by means of physical force or unlawful threats which destroys the victim's free will and compels him to comply with some demand of the party exerting the coercion." *Wise v. Midtown Motors, Inc.*, 231 Minn. 46, 51, 42 N.W.2d 404, 407 (1950). There is nothing in the record here to suggest appellant was subjected to any physical force or unlawful threats. Indeed, during oral arguments before this court her attorney acknowledged this is not a case of duress.

"Undue influence" means "coercion, amounting to a destruction of one's free will, by means of importunities, flatteries, insinuations, suggestions, arguments, or any artifice not amounting to duress." *Sullivan v. Brown*, 225 Minn. 524, 530, 31 N.W.2d 439, 443 (1948). Again, during oral arguments before this court, appellant's attorney acknowledged there was no loss of free will in this case. Instead, he argued what had been argued at the March 16 hearing: that this was an unusual case because appellant saw N.M.C. weekly after he had been placed in foster care, bonded with him, and exhibited ambivalence during this period. Appellant suggests there should have been a trial period during which she would have been prohibited from seeing N.M.C. However, Catholic Charities' policy of allowing appellant visitation with N.M.C. prior to termination of her parental rights cannot be characterized as undue influence.

Appellant also contends a confidential relationship existed between her and Catholic Charities. As such, there may have been some conflict of interest inherent in Catholic Charities' role as the placement agency and as appellant's counselor. This argument was not raised below. *See K.T.*, 327 N.W.2d at 16–17 ("[I]t is well settled that a party may not raise for the first time on a appeal a matter not presented to the court below"). Even if reviewable, appellant fails to provide any facts showing Catholic Charities' actions were improper.

Appellant also argues had discovery been completed prior to dismissal of her petitions, she might have discovered facts to buttress her allegations of undue influence. By its nature, undue influence has a substantial subjective component. Appellant would necessarily know whether certain conduct by Catholic Charities interfered with her free will. She cannot now argue she needs discovery in order to uncover facts which more properly should have been asserted in her petitions.

Finally, examination of the procedural history of this case illustrates appellant was given numerous opportunities to present any facts she might have to support her claims. At the September 9, 1988 hearing, the referee expressly asked her whether she understood the ramifications of her decision and whether anyone had exerted "improper pressures" on her. She was represented by her attorney at each of the three hearings held following the filing of her petitions. At one of those hearings she personally appeared and was given an opportunity to speak. She was given additional time to file written memoranda in support of her petitions; in none was she able to articulate facts to support her allegation of undue influence.

We fully agree with the sentiments expressed by the district court in the memorandum attached to its March 15 order dismissing the petitions:

> While this Court recognizes that a parent who loves her child as [appellant] obviously does, goes through great anxiety, stress and grief over a decision to give that child up for adoption, it is also possible that such emotions could be confused with undue influence and duress as a means of regaining that child when the natural parent changes her mind. If the courts were to always allow the argument that an individual was unduly influenced or placed under duress during an otherwise emotional decision to give up a child for adoption, the door of certainty and finality would never be closed and the best interests of the child could never be served.

Our decision here effectively requires a parent seeking to set aside termination of parental rights to allege facts sufficient to show duress, undue influence, or fraud before a full evidentiary hearing will be held. As the adoptive parents note, application of such a rule to this case may (1) prevent the disruption of a child's life except where a party makes a prima facie showing of facts sufficient to justify such disruption and (2) preserve judicial resources by screening out cases where a parent seeks to revoke consent for inadequate reasons.

### DECISION

Because appellant has failed to allege facts sufficient to support her claim of duress and undue influence, we affirm dismissal of her petitions to set aside termination of her parental rights.

Affirmed.